# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

IDA ROSADO,
*Administratrix for the estate*
*of Edwin Rosado,*
     *Plaintiff,*

    v.

SCOTT SEMPLE *et al.*,
    *Defendants*.

No. 3:20-cv-1908 (JAM)

## ORDER GRANTING MOTION TO DISMISS

Edwin Rosado was on parole from prison and living in a nursing home when he died from conditions related to chronic Hepatitis C. The administratrix of his estate has filed this lawsuit against the Connecticut Department of Correction ("DOC") and three prison physicians. The amended complaint alleges that the DOC discriminated against Rosado because of his disability, and it further alleges that the three physicians were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.

The defendants now move to dismiss. As to the disability discrimination claim, the defendants argue that the complaint does not allege facts to plausibly show that the DOC's allegedly inadequate medical treatment of Rosado's condition was because of Rosado's disability. As to the claims against the three physicians, the defendants argue that they are time-barred by the statute of limitations. I agree with the defendants' arguments and will therefore grant their motion to dismiss the complaint without prejudice.

1

**BACKGROUND**

I accept as true the following facts as alleged in the proposed amended complaint.[1] Plaintiff Ida Rosado is administratrix of the estate of her deceased brother, Edwin Rosado.[2] Rosado was in and out of prison for much of his life. He was first incarcerated in 1975, and he was discharged and reincarcerated at various DOC facilities a total of nine times before his release to supervised parole and subsequent death in December 2017.[3]

Since at least 2007 the DOC was aware that Rosado lived with the Hepatitis C Virus ("HCV").[4] HCV can cause liver cancer and other liver-related disease.[5]

The standard of care for individuals with HCV has evolved rapidly in recent years. Prior to 2011, standard treatments were often ineffective, inconvenient, and associated with many severe side effects.[6] In 2011, however, the Food and Drug Administration began approving new oral medications called direct-acting antiviral drugs ("DAAs").[7] While DAAs were at first designed to work in tandem with the old treatment regimen, in 2013 the FDA began to approve DAAs that could be taken alone.[8] DAAs work more quickly, cause fewer side effects, and treat chronic HCV more effectively than the old treatment regimen; in fact, 90 to 95 percent of HCV

---

[1] This ruling cites and refers to the proposed amended complaint. Doc. #24-2. On June 17, 2021, the Court granted the motion for leave to file an amended complaint, Doc. #29, but the plaintiff has not separately filed the amended complaint which names a group of different defendants than the original complaint and as reflected in the current case caption on the Court's docket. After a court grants a motion for leave to file a proposed amended complaint, a plaintiff should promptly file the amended complaint as a separate document on the docket. The Clerk of Court shall amend the case caption to terminate the two defendants—Scott Semple and Kathleen Maurer—who were initially named as defendants in the original complaint but who have not been named in the amended complaint, and the Clerk of Court shall add the Connecticut Department of Correction as a defendant to the case caption.

[2] Doc. #24-2 at 2, 16 (¶¶ 4, 105).

[3] *Id.* at 9 (¶¶ 51–53).

[4] *Ibid.* (¶¶ 54–55).

[5] *See id.* at 6 (¶ 31); *see also Barfield v. Semple*, 2019 WL 3680331 at *1–2 (D. Conn. 2019) (discussing Hepatitis C, the standard of care for Hepatitis C and the DOC's treatment of prisoners with Hepatitis C).

[6] Doc. #24-2 at 4 (¶ 22).

[7] *Ibid.* (¶ 23).

[8] *Ibid.*

patients treated with DAAs are cured, whereas the old treatment regime cured only about one-third of patients.[9]

DAAs have been part of the medical standard of care since at least January 2016.[10] The American Association for the Study of Liver Diseases ("AASLD") and the Infectious Disease Society of America ("IDSA"), which together set forth the medical standard of care for the treatment of HCV, recommend immediate treatment with DAA drugs for all people with chronic HCV.[11] The Centers for Disease Control and Prevention encourages health professionals to follow this standard of care, and Medicaid guidelines are also consistent with the IDSA/AASLD standard of care.[12]

The DOC's treatment of Rosado's disease, however, fell well short of these standards. At all times relevant to this case, DOC inmates received medical care through a partnership with the University of Connecticut Health Center known as the Correctional Managed Health Care ("CMHC") program.[13]

The DOC's treatment of prisoners with HCV was governed by CMHC Policy G 2.04.[14] According to the policy, the evaluation of candidates for Hepatitis C treatment as well as the implementation of Hepatis C therapy itself was to be performed by infectious disease ("ID") specialists.[15]

---

[9] *Ibid.* (¶¶ 24–25).
[10] *Id.* at 5 (¶¶ 27–29).
[11] *Ibid.*
[12] *Ibid.* (¶¶ 27, 30).
[13] *See Barfield*, 2019 WL 3680331 at *2.
[14] *See* Doc. #24-2 at 6–7 (¶¶ 37–38); *see also* UConn Health, Correctional Managed Health Care, *Policy and Procedures for Use Within the Connecticut Department of Correction*, https://health.uconn.edu/correctional/wp-content/uploads/sites/77/2016/12/G-Special-Needs-and-Services.pdf; *Barfield*, 2019 WL 3680331 at *2.
[15] Doc. #24-2 at 7 (¶ 39).

Policy G 2.04 also created a Hepatitis C Utilization Review Board ("HepCURB"), comprised of ID specialists, to review all requests for Hepatitis C treatment.[16] Policy G 2.04 provided that, "in general," HepCURB would follow the specific recommendations of the AASLD and IDSA, which both recommend immediate treatment with DAAs for all people with chronic HCV.[17]

At the same time, the policy contravened the IDSA/AASLD guidelines insofar as it provided that CMHC physicians would not "directly provide specific anti-viral drugs for Hepatitis C."[18] According to the complaint, Policy G 2.04 was inadequate not only because it rationed and delayed treatment until a patient could "manage[ a] labyrinthine structure of approvals," but also because it relied on an ID specialist's individual judgment rather than on the community standard of care for treatment of HCV.[19]

CMHC and DOC records show that Rosado was chronically undertreated for his HCV. He received a diagnosis of HCV no later than October 2007.[20] But his medical records from 2008 to 2011 did not reflect his diagnosis at all, and he received no steps toward treatment.[21] From June 2012 to August 16, 2016, no blood work was ordered for him,[22] despite the fact that he saw several DOC medical providers during that same period.[23] In one visit, on July 20, 2012, Rosado complained of symptoms consistent with HCV, yet the providers neglected to connect those symptoms to his HCV status.[24] At other times, the DOC's records failed to document

---

[16] *Ibid.* (¶ 40).
[17] *Ibid.*
[18] *Ibid.* (¶ 41).
[19] *Id.* at 8 (¶¶ 43–44).
[20] *Id.* at 9 (¶ 55).
[21] *Id.* at 10 (¶¶ 56-57).
[22] *Id.* at 12 (¶ 76).
[23] *Id.* at 10–11 (¶¶ 62, 65, 70, 73).
[24] *Id.* at 10 (¶ 62).

4

Rosado's untreated HCV altogether.[25] The HepCURB repeatedly failed to take action on Rosado's case. It met on April 22, July 29, and November 4, 2016, but Rosado's case was discussed at none of those meetings.[26]

The complaint identifies and names as defendants three physicians who were especially responsible for denying or delaying Rosado's medical care. The first was Dr. Monica Farinella, who acted as Rosado's prescribing physician while he was incarcerated at New Haven Correctional Center from February 10 to August 22, 2016, and who is also alleged to have been the acting medical director at CMHC until Rosado's death.[27] On August 16 and 17, 2016, Dr. Farinella ordered blood work and an X-ray in response to Rosado's complaints of abdominal pain.[28] The blood results came back as abnormal, and the X-ray results twice came back as incomplete, but Dr. Farinella failed to follow up on either set of tests.[29]

The next physician was Dr. S. Johar Naqvi. On August 22, 2016, Rosado was transferred to MacDougall-Walker Correctional Institution, where Dr. Naqvi provided him with primary care.[30] On August 24, 2016, Dr. Naqvi ordered a Hepatitis profile screening, which is designed to detect and diagnose an acute hepatitis infection.[31] On August 31, 2016, Dr. Naqvi requested an infectious disease consult for Rosado.[32] On September 14, 2016, Rosado had not yet been seen by an ID specialist, and Dr. Naqvi followed up with a second request for an ID consult.[33]

---

[25] *Id.* at 11 (¶ 66).
[26] *Id.* at 11, 14 (¶¶ 71, 90).
[27] *Id.* at 2 (¶ 7).
[28] *Id.* at 12 (¶¶ 77–78).
[29] *Ibid.* (¶¶ 77–79).
[30] *Id.* at 3, 13 (¶¶ 11, 81).
[31] *Id.* at 13 (¶ 82).
[32] *Ibid.* (¶ 83).
[33] *Ibid.* (¶ 86).

The third physician was Rosado's ID specialist, Dr. Omprakash Pillai. Rosado was not seen by Dr. Pillai until more than two months after Dr. Naqvi's initial ID consult request.[34] As a member of HepCURB, Dr. Pillai had attended multiple HepCURB meetings where Rosado's case was not considered.[35] On November 10, 2016, Dr. Pillai met with Rosado and documented that he possibly had advanced liver disease; Pillai's notes also document requests for further testing and a plan by Dr. Pillai to submit Rosado's paperwork at HepCURB.[36] By February 2017, the HepCURB had still not considered Rosado's case, despite Dr. Pillai's attendance at the HepCURB meeting of February 3, 2017.[37]

In April 2017, tests on Rosado revealed signs of liver cancer.[38] That same month, Dr. Pillai noted in Rosado's medical records that he had been diagnosed with Hepatitis C 15 years before, that he had received "no treatment," and that he needed treatment urgently.[39] Dr. Pillai again made plans to "[d]iscuss [Rosado] at next HepCURB."[40] Yet months after being referred by Dr. Naqvi, Rosado still had not received treatment for his Hepatitis C.[41]

On May 11, 2017, Rosado received treatment for his liver cancer at John Dempsey Hospital.[42] Days later, Rosado was growing anxious with his condition and the quality of his care. In an Inmate Request Form filed on May 16, 2017, he wrote: "was told That I would be Seen By Dr. Pill[a]i on Monday The 15th I Then send a Request telling you about . . . pain . . . where The work was Being Done I Fe[e]l Like no-one gives a Dam[n] But I Do So can someone

---

[34] *Id.* at 3, 14 (¶¶ 15, 89, 93).
[35] *See id.* at 11, 14 (¶¶ 72, 91, 97).
[36] *Id.* at 14 (¶ 92).
[37] *Ibid.* (¶¶ 96–97).
[38] *Id.* at 15 (¶¶ 99–101).
[39] *Ibid.* (¶ 104).
[40] *Ibid.* (¶ 101).
[41] *Ibid.* (¶ 102).
[42] *Id.* at 16 (¶ 106).

please call me Down."[43] Despite various test results and visits with multiple providers showing

the urgency of his condition—and despite Dr. Pillai's attendance at multiple HepCURB meetings

in the interim—Rosado's case was not reviewed by HepCURB until May 19, 2017.[44]

On August 1, 2017, Rosado was released to supervised parole.[45] He resided at a nursing

home in Rocky Hill, Connecticut; the complaint asserts without elaboration that Rosado was

"still under the control and custody of the Department of Correction" at this time.[46] The

HepCURB met on August 18, 2017, although it is not alleged whether Rosado's case was

reviewed.[47] Both Dr. Pillai and Dr. Farinella attended this meeting.[48]

On September 12, 2017, Rosado was placed under the care of a different physician, Dr.

Kerrigen, who is not named as a defendant in this action.[49] More than three months later, Rosado

died on December 23, 2017. His causes of death include Hepatitis C and liver cancer.[50]

On December 22, 2020, the plaintiff filed this federal lawsuit.[51] The amended complaint

alleges four claims.[52] Count One alleges a claim against the DOC for disability discrimination in

violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*,

and Counts Two, Three, and Four allege claims under 42 U.S.C. § 1983 against Dr. Naqvi, Dr.

Pillai, and Dr. Farinella, respectively, for deliberate indifference to Rosado's serious medical

needs in violation of the Eighth Amendment.[53]

---

[43] *Ibid.* (¶ 108).
[44] *Id.* at 17 (¶ 109). Because the complaint does not allege an earlier meeting at which Rosado's case was reviewed, I infer that his case was first reviewed on May 19, 2017.
[45] *Ibid.* (¶ 115).
[46] *Ibid.*
[47] *Id.* at 18 (¶ 117).
[48] *Ibid.* (¶ 118).
[49] *Ibid.* (¶ 119).
[50] *Ibid.* (¶ 120).
[51] Doc. #1.
[52] Doc. #24-2.
[53] Doc. #24-2.

The defendants now move to dismiss the complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[54]

**DISCUSSION**

The standard that governs a motion to dismiss under Rule 12(b)(6) is well established. A complaint may not survive unless it alleges facts that, taken as true, give rise to plausible grounds to sustain a plaintiff's claims for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018). A court must "accept as true all factual allegations and draw from them all reasonable inferences; but [it is] not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019).[55]

### *ADA discrimination (Count One)*

In Count One, the complaint alleges that the DOC discriminated against Rosado on the basis of his HCV and in violation of the Americans with Disabilities Act (ADA). To state a claim for disability discrimination under Title II of the ADA, a plaintiff must allege that 1) "he is a qualified individual with a disability"; (2) "[the defendant] is an entity subject to the act[]"; and (3) "he was denied the opportunity to participate in or benefit from [the defendant's] services, programs, or activities or [the defendant] otherwise discriminated against him by reason of his disability." *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016). For the purposes of their motion to dismiss, the defendants do not contest that Rosado was a qualified individual under the first prong or that the defendants are subject to the act under the second

---

[54] Doc. #31.
[55] Unless otherwise indicated, this opinion omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

prong.[56] Rather, the defendants argue that the complaint lacks allegations to suggest that Rosado was denied benefits or opportunities or otherwise discriminated against because of his disability.

It is well established that the ADA does not apply to claims primarily challenging the *quality* of medical services. *See, e.g.*, *Barfield v. Semple*, 2019 WL 3680331 at *15 (D. Conn. 2019). "[T]he fact that a disabled prisoner is subject to adverse treatment does not constitute a violation of the ADA's anti-discrimination provision absent evidence that the adverse treatment was by reason of the prisoner's disability." *Currytto v. Furey*, 2019 WL 1921856 at *4 (D. Conn. 2019). Accordingly, "[c]ourts routinely dismiss ADA suits by disabled inmates that allege inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability." *Elbert v. New York State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590, 595–96 (S.D.N.Y. 2010) (dismissing ADA claim because plaintiff was "claiming that [he] was not properly treated *for* his [disability], not that he was mistreated *because* of his [disability]") (emphasis in original).

Here, the complaint is replete with allegations that Rosado was denied proper medical treatment, but it does not allege facts to plausibly show that Rosado was so treated *because of* his disability. The complaint alleges that "[b]y withholding medical treatment from Rosado who had HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendants excluded Rosado from participation in, and denied him the benefits of [] DOC services and CHMC programs, and activities (such as medical services), by reason of his disability."[57] Such a verbatim and conclusory recital of the elements is insufficient by itself to state a claim for disability discrimination under the ADA. *See Barfield*, 2019 WL 3680331 at

---

[56] Doc. #31-1 at 13.
[57] Doc. #24-2 at 19–20 (¶ 128); *see also id.* at 9 (¶ 49) ("Defendants withheld treatment from Rosado, but did not categorically withhold treatment from prisoners with other similar diseases or conditions (such as HIV) or from other prisoners without similar diseases or conditions.").

*16 (dismissing claim supported by nearly identical allegation that "[b]y withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant CT DOC excludes Plaintiff and the Plaintiff Class from participation in, and denies them the benefits of CT DOC services, programs, and activities (such as medical services), by reason of their disability").

Moreover, this case is distinguishable from cases where a prisoner is denied access to medical services by reason of his disability. *See Walsh v. Coleman*, 2020 WL 7024927 at *5 (D. Conn. 2020) (denying motion to dismiss because "[plaintiff] is not just claiming that he was denied access to prison services of single-cell status and solo transport; rather, he claims that [those services] are the accommodations he seeks so that he can access medical services notwithstanding his disability"). Here, the complaint does not allege facts to show that Rosado was denied an accommodation that would have permitted him to access medical services. Rather, the complaint concerns only the denial of the medical services themselves.

Accordingly, I will grant the defendants' motion to dismiss Count One of the amended complaint. Because the complaint does not state a plausible claim for disability discrimination, I need not consider any of the defendants' other arguments for dismissal of this claim.

### *Deliberate indifference (Counts Two, Three, and Four)*

Counts Two, Three, and Four of the amended complaint allege that Dr. Naqvi, Dr. Pillai, and Dr. Farinella, respectively, denied and delayed Rosado's treatment for HCV in deliberate indifference to his serious medical needs. The defendants argue that these claims are time-barred. I agree.

As an initial matter, "[a]lthough the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a

Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015). Accordingly, I restrict my review of the defendants' arguments for dismissal to the facts that have been alleged in the complaint.

In Connecticut, a plaintiff must bring a § 1983 claim within three years of when he "kn[ew] or ha[d] reason to know of the injury which is the basis of his action." *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002); *see Lounsbury v. Jeffries*, 25 F.3d 131, 134 (2d Cir. 1994); Conn. Gen. Stat. § 52-577. "The cause of action accrues even though the full extent of the injury is not then known or predictable." *Wallace v. Kato*, 549 U.S. 384, 391 (2007).

It is clear from the amended complaint that Rosado was aware of his injury stemming from the alleged deliberate indifference of each of the doctor defendants no later than June 2017, shortly after he told prison authorities that "no[]one gives a [d]am[n]" about his condition.[58] But this action was not filed until December 22, 2020—more than three years after any of the acts or involvement that the complaint attributes to any of the doctor defendants. Accordingly, the action is barred unless there exists some reason to either delay accrual of the claims or toll the limitations period.

The plaintiff argues that the limitations period was tolled until the day of Rosado's death because of the defendants' continuous course of unlawful conduct. Under the "continuing course of conduct" doctrine, Connecticut courts will deem a statute of limitations tolled if the defendants "(1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the alleged original wrong; and (3) continually breached that duty." *Evanston Ins. Co. v. William Kramer & Assocs., LLC*, 890 F.3d 40, 45 (2d Cir. 2018) (quoting *Flannery v. Singer Asset Fin. Co.*, 312 Conn. 286, 313 (2014)). "[W]hen the wrong sued upon

---

[58] Doc. #24-2 at 16 (¶ 108).

consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed." *Flannery*, 312 Conn. at 311; *see also Silberberg v. Lynberg*, 186 F. Supp. 2d 157, 167–68 (D. Conn. 2002) (applying continuing course of conduct doctrine to § 1983 action); *Witt v. St. Vincent's Med. Ctr.*, 252 Conn. 363, 369–70 (2000) (continuing course of conduct in medical malpractice context).

The defendants construe Rosado's tolling argument as relating to a conceptually and nominally similar but formally distinct federal *accrual* doctrine known as the "continuing violation doctrine." "The continuing violation doctrine is an exception to the normal knew-or-should-have-known accrual date." *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009) (holding that doctrine applies to § 1983 deliberate indifference claims). To delay the accrual of a deliberate indifference claim under the continuing violation doctrine, "[a] plaintiff must allege both the existence of an ongoing policy of deliberate indifference to his or her serious medical needs and some non-time-barred acts taken in the furtherance of that policy." *Id.* at 182.

Because both the state tolling doctrine and the federal accrual doctrine would command the same result in this case, I need not decide which, if either, is more appropriate here. *See Pearl*, 296 F.3d at 83–84 (declining to distinguish accrual from tolling because "whether [the circumstances] postpone[] accrual of a cause of action and [are] therefore a matter of federal law or whether . . . it is one of the state 'tolling rules' we borrow . . . the analysis of [plaintiff's] claims is unaffected").

Here, in light of the facts as alleged in the amended complaint, the claims are time-barred under either doctrine. Even accepting the allegation that the DOC as an institution retained "control and custody" of Rosado after he was released to parole in August 2017, the complaint does not allege any facts to permit a reasonable inference that any of the *individual defendants*

committed any non-time-barred acts of deliberate indifference with respect to Rosado. "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To the extent that a claim for deliberate indifference may be based on a defendant's omissions or inaction, the complaint does not allege facts to suggest that the individual defendants owed and breached continuing duties of care to Rosado after he was released to a nursing home and placed under the care of a different physician.

According to the amended complaint, Dr. Farinella's last alleged interaction with Rosado occurred in August 2016. Similarly, Dr. Naqvi's only involvement in Rosado's case occurred between August and October 2016, and Dr. Pillai's last direct involvement appears to have occurred on July 28, 2017, when he ordered additional testing for Rosado. Except for the attendance by Dr. Farinella and Dr. Pillai at a meeting of HepCURB on August 18, 2017,[59] it does not appear from the complaint that any of the individual defendants had involvement in or responsibility for Rosado's medical care past the month of August 2017, when he was released to a nursing home on supervised parole. Moreover, the fact that on September 12, 2017, Rosado was "placed under the care of" a non-party physician strongly suggests that any duty once owed by the individual defendants to Rosado had by then terminated.

Because the face of the complaint makes clear that the deliberate indifference claims against Dr. Naqvi, Dr. Pillai, and Dr. Farinella are untimely, I will grant the defendants' motion

---

[59] As to the HepCURB meeting of August 18, 2017, the complaint alleges only that "the HepCURB did not approve [Rosado's] treatment." Doc. #24-2 at 18 (¶ 117). The complaint does not allege that the board actually considered Rosado's case or that either Dr. Farinella or Dr. Pillai took part in the board's failure to approve treatment. Nonetheless, construing the allegations in the light most favorable to the plaintiff, I accept as true that Rosado's case was discussed at the HepCURB meeting of August 2017 and that the HepCURB affirmatively denied him treatment.

to dismiss Counts Two, Three, and Four of the amended complaint. This dismissal is without prejudice to the filing of an amended complaint that pleads facts sufficient to plausibly show that any claim against each individual defendant is not barred by the statute of limitations.

CONCLUSION

For the reasons set forth above, the Court GRANTS the defendants' motion to dismiss the amended complaint (Doc. #24-2). The Clerk of the Court is directed to close the case. The Court's ruling is without prejudice to the filing of an amended complaint on or before April 1, 2022, if there are grounds to allege additional facts that overcome the concerns stated in this ruling.

It is so ordered.

Dated at New Haven this 6th day of March 2022.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge